**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,

               Plaintiff,

     v.

LEONARD A. PELULLO,

               Defendant.

Crim. No. 94-0276  (DRD)
Civ.   No. 01-0124  (DRD)
Civ.   No. 11-6678  (DRD)

**O P I N I O N**

*Appearances by:*

Paul J. Fishman
United States Attorney
By:     Leslie F. Schwartz, Assistant United States Attorney
         Norman J. Gross, Assistant United States Attorney
970 Broad Street, Suite 700
Newark, New Jersey 07102

     *Attorney for United States of America*

Leonard A. Pelullo
Fed. No. 44140-066
L.S.C.I., Allenwood
P.O. Box 1000
White Deer, PA 17887

     *Defendant Pro Se*

**DEBEVOISE, Senior District Judge**

Two defense applications are pending before the Court.  First, Defendant Leonard Pelullo moves for relief pursuant to the inherent supervisory powers of the Court on the ground that the government made false statements in connection with his latest Rule 60(b) and (d) motion. Second, Defendant petitions this Court for bail in connection with the above request. For the reasons set forth below, both applications are DENIED.

## I.    BACKGROUND

The extensive background of this case—stretching almost two decades—is well known to the parties and will not be repeated. The relevant facts are as follows.

Defendant's most recent motion, like numerous motions that preceded it, had its origins in the 2005 reversal by the Court of Appeals of this Court's May 17, 2002 order granting Defendant's motion for a new trial. This Court had granted a new trial in part on the ground that the government violated its Brady obligations by failing to turn over to Defendant certain documents in the possession of the Department of Labor ("DOL") and its Pension and Welfare Benefits Administration ("PWBA"). The Court of Appeals held that the government did not have an obligation to turn over these documents, rejecting this Court's conclusion that the DOL and PWBA should be considered part of the "prosecution team." United States v. Pelullo, 399 F. 3d 197, 216 (3d Cir. 2005).[1] From that date forward Defendant has contended that the government, the DOL and PWBA were a part of the prosecution team, and that the government fraudulently represented otherwise to the Court of Appeals and this Court.

---

[1] The Court of Appeals did not address the question of whether the withheld documents constituted Brady material. 399 F. 3d at 219 ("[w]e therefore need not determine whether that information is favorable to the defense and material, or whether there 'is reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'").

On July 22, 2011 the Court issued an opinion (the "2011 Opinion") and order deciding two motions of Defendant, Leonard Pelullo, of which only one is now at issue: his motion for relief pursuant to Federal Rule of Civil Procedure 60 (b) and (d) on the ground that the government misrepresented material facts to the Court of Appeals and to this Court. (Doc. Nos. 92, 94). The Court treated that motion as an application for leave to file a subsequent § 2255 petition and transferred it to the Court of Appeals. Defendant appealed this ruling to the Court of Appeals, where he is represented by Lawrence S. Lustberg, Esq. and Thomas R. Valen, Esq. (Doc. No. 95).

On or about November 3, 2011 Defendant, proceeding pro se, filed a "Motion for the Court to Exercise its Supervisory Power to Dismiss the Indictment or Grant a New Trial and Initiate Disbarment Proceedings against the Prosecutors and Hold Those Prosecutors in Contempt for Violating Court Orders." (Doc. No. 1).

On November 11, 2011 the government filed a short letter motion to dismiss this new application, arguing that the new motion was a second or successive § 2255 motion and that because Defendant has not obtained authorization from the Court of Appeals this Court lacks jurisdiction. (Doc. No. 330).

In a December 14, 2011 submission Defendant refined the nature of his present claims for relief, emphasizing that they are not an attack on the judgment against him. He "does not request findings at this time as to his [THIRD] claim that the Prosecutors are in contempt of court's orders to produce all exculpatory evidence either in the government's or constructive possession and that the Court should exercise its Supervisory Power to dismiss the indictment or grant a new trial." (Def. Dec. 14 Brief, fn 2).

Rather, Defendant's motion seeks to vacate the Court's 2011 Opinion on the ground that in support of the order now under appeal, AUSAs Leslie F. Schwartz and Norman J. Gross knowingly filed false affidavits authored by former prosecution team members former AUSA Arthur Zucker and former DOL Agent Rosario Ruffino. This, according to Defendant, constitutes misprision of a felony in violation of 18 U.S.C. § 4, obstruction of justice in violation of 18 U.S.C. § 1503 and conspiracy to obstruct justice in violation of 18 U.S.C. § 371.

Next, Defendant asserts that AUSAs Schwartz, Gross and Zucker violated the New Jersey Rules of Professional Conduct (made applicable to members of the bar admitted to practice in this Court. L. Civ. R. 103.1(a)): "i) Schwartz, Gross (and Zucker) violated those rules by knowingly submitting both Zucker and Ruffino's false affidavits to this Court asserting that those affidavits were true when in fact they knew that the affidavits were false. ii) the prosecutors lied to this Court that Petitioner in 1995 did not make arrangements to pay for and copy the alleged discovery offered by the government pretrial (1995) when in fact they knew without doubt that Petitioner paid for the discovery and iii) the prosecutors lied to this Court as to the source of the George Hellhake Ocean Properties of Delaware deposition." (Def. Dec. 14 Brief p. 7).

The 2011 Opinion relied upon the vast array of documents, certifications and other submissions received in connection with the various proceedings before the Court. It described at great length the many documents that Defendant contends establish that the DOL, and in particular its PWBA, did not simply contribute a small number of its personnel to assist in the prosecution, limiting its active role to monitoring the civil proceedings brought on behalf of Compton Press. The 2011 Opinion summarized many of the documents relied upon by

Defendant to establish that the DOL and PWBA were full blown and continuing members of the prosecution team.

On May 12, 2006 Defendant filed a Rule 60(b) motion for relief based on the contention that documents he had received after May 12, 2005 pursuant to FOIA requests further demonstrated that the PWBA was an integral part of the prosecution team. He moved for bail, and in the opinion denying the bail motion the Court described in considerable detail the Defendant's supporting documents. In the 2011 Opinion the Court referred to that opinion and the documents referred to in it. (2011 Opinion at 11, 12). The purpose of referring to this Rule 60(b) motion is to show that when the 2011 Opinion was issued the Court was aware of pertinent documents upon which Defendant relies in his pending motion.

The 2011 Opinion also noted that on or about May 17, 2010 Defendant filed another Rule 60(b) motion contending that documents more recently acquired pursuant to FOIA requests established that the government "knowingly misrepresented the PWBA's actual role in the prosecution team and its access to the exculpatory documents in the possession of the PWBA agents who monitored the civil litigation." (2001 Opinion at 16). The 2011 Opinion at 17-18 described Defendant's May 17, 2010 Rule 60(b) motion:

> The May 17, 2010 Rule 60(b) motion was supported by documents that Pelullo had recently received pursuant to his FOIA requests. These documents supported a strong argument that, however one defines "prosecution team," the PWBA did more than contribute a limited number of its personnel to work with the prosecution and otherwise limit its activities to monitoring the civil case against Pelullo. For example, a November 15, 1990 letter to Chief Stewart of the Strike Force, DOL's Special Agent in Charge wrote "OLR, FBI and PWBA (DOL) have opened an investigation of a potential embezzlement (18 U.S.C. 664) of 3,000,000 from the benefit plans of Compton Press which was sold in 1987 to Equity Finance Group. Leonard Pelullo, a Scarfo LCN associate." A further example, a November 13, 1996 press release of the DOL on the occasion of the jury verdict finding Pelullo guilty on all 54 counts of the Indictment, included the statement that "[t]he investigation leading to the conviction was conducted by the U.S. Labor Department's OIG and PWBA and the Federal Bureau of Investigation."

The Opinion described numerous documents from which it could be argued that the DOL and PWBA were not only members of the prosecution team but were important members.

While the motion leading to the 2011 Opinion was pending, Defendant submitted additional DOL documents that he argued supported his contention that the government knew that the PWBA was a part of the prosecution team. These documents were:

i) a February 22, 1991 handwritten note from Ruffino to AUSA Arthur Zucker who at the time was handling the criminal case.

ii) a handwritten note of Michael Briglas (who filled PWBA Agent Pascale's role in December 1991) in which he describes developments in the Compton Press civil litigation.

iii) DOL-OIG documents that appear to correspond to entries in an index of documents from the PWBA files previously provided to the Court.

iv) Deposition of George Hellhake from the Ocean Properties Bankruptcy proceedings.

v) Notes of Ruffino taken during an interview of Janice Larson.

Thus it would seem that before the Court issued the 2011 Opinion Defendant, the government and the Court had the documents upon which Defendant now relies.

Whether Defendant's present motion asserts a criminal charge, a violation of the Rules of Professional Conduct or fraud upon the Court, it comes down essentially to one allegation – that the named prosecutorial participants in the case perpetrated a fraud when they knowingly misrepresented to the Court of Appeals and this Court the role of the DOL and PWBA in the prosecution of this case.

The Court addressed this issue in its 2011 Opinion when ruling upon the question whether, as Defendant contended, the Court had jurisdiction to hear his application under Rule 60 (d) that provides:

(d) Other Powers to Grant Relief. This rule does not limit a court's power to:

(1) entertain an independent action to relieve a party from a judgment,

order, or proceeding,

. . .

(3) set aside a judgment for fraud on the court.

The Opinion noted that "[d]uring the many years when Pelullo faced civil and criminal actions both the DOL and the United States Attorney's Office personnel changed. For example, in the United States Attorney's Office initially AUSA Robert C. Stewart assumed supervision of the Pelullo investigation and prosecution, followed by a series of Assistant United States Attorneys ("AUSAs"): AUSA Arthur P. Zucker (1990 - ), AUSA Jose P. Sierra (1992 – 1995), AUSA Mark W. Rufolo (1995 - ), and AUSA Leslie Schwartz ( to date)" (Opinion at 30). AUSA Norman Gross's participation began during the appellate proceedings.

Ruling on the question whether Defendant had established fraud for the purposes of Rule 60(d)(3), the Court stated in part:

The evidence upon which Pelullo relies to establish his claim of fraud on the court is set forth extensively in the Court's June 25, 2010 opinion addressing Pelullo's bail application.

. . .

In addition, Pelullo has submitted additional DOL documents along with his May 10, 2011 reply brief concerning his <u>Santos</u> motion.

The new documents upon which Pelullo relies are largely of DOL origin, describing the roles of the PWBA, OIG and OLR, often in cooperation with the FBI. They portray the major role that the DOL played in the entirety of the proceedings against Pelullo – almost an exclusive role in the civil proceedings and an important cooperative role in the criminal proceedings. (Opinion at 30).

. . .

The meaning of "prosecution team" can be debated, and, depending upon that meaning, it can be persuasively argued the government's description of the DOL's role in the Pelullo investigation, prosecution and trial was not accurate. But there is no evidence that any government attorney acted with the intent to deceive either the Court of Appeals or this Court concerning that role. (Opinion at 31).

In his present motion Defendant challenges these findings and the Court's holding in the 2011 Opinion.

## I.    ARGUMENT

### A.    Standard of Review

As a threshold matter, Defendant has limited procedural avenues available to him to proceed before this Court. Defendant has long since exhausted his direct appeal rights, and the Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, Pub. L. No. 104-132, Tit. I, 110 Stat. 1214 limits his ability to file more than one collateral challenge to his sentence. Under AEDPA, a defendant has one year within which to file his first request for relief from the latest of four specified events, which in this case is the date the judgment of conviction became final. 28 U.S.C. § 2255. Before a defendant may seek a second or successive application for such relief from a district court, he must move before the pertinent Court of Appeals for an order authorizing the district court to consider the motion. Id.

Defendant has obtained no such order here. Instead Defendant contends that his application should not be considered a collateral attack on his sentence. Indeed, he claims that his petition "asserts misconduct by the prosecutors – AUSA's Gross, Leslie Schwartz, and former AUSA's Mark Rufolo and Arthur Zucker – not the government." (Pet. Dec. 28 2011 Letter). In addition to his request that the Court disbar the offending attorneys, Defendant asks that the Court "exercise its supervisory power to dismiss the indictment or grant a new trial" because of the alleged misconduct by prosecutors. (Pet. Br. 1).

This tactic of relabeling a habeas petition as something else in an effort to bypass the restrictions of AEDPA has been soundly rejected by Courts of Appeals. Pridgen v. Shannon, 380 F.3d 721, 727 (3d 2004) ("when …[a] motion seeks to collaterally attack the petitioner's underlying conviction, the motion should be treated as a successive habeas petition"); see also United States v. Barrett, 178 F.3d 34, 55 (1st Cir. 1999) ("The same rationale also makes inappropriate any use of our 'inherent power' or 'supervisory power' to circumvent Congress's [AEDPA] restrictions."). Defendant is well aware of this rule, having previously filed multiple § 2255 petitions under the guise of Rule 60 applications. See e.g., Defendant's May 15, 2006 and May 17, 2010 Motions (Doc. Nos. 23, 293). As this latest motion is just another attack on his conviction, the Court is under no obligation to entertain Defendant's request.

However, since the alleged misconduct identified by Defendant is likely to feature in subsequent applications, either to this Court or to the Court of Appeals, the Court will discuss why the statements that Defendant identifies, even if properly before the Court, would not justify the relief that he seeks.

**B.**      **Alleged Misrepresentations**

Defendant's brief is over three times the length permitted by L. Civ. R. 7.2[2] and makes reference to scores of events and evidence from the extensive record of this litigation. However, the only relevant portions of his argument concern a handful of alleged misstatements made in

---

[2]      The nature of Defendant's application is somewhat mixed. The papers filed in connection with this matter are scattered across three dockets, one criminal (94-cr-276), and two civil (01-cv-124 and 11-cv-6678). Some filings appear on multiple dockets, and some can be found only on one or the other. The instant motion is captioned with two of the docket numbers, but actually appears only on the third. While Defendant purportedly invokes criminal statutes in his papers, the application is effectively a challenge to the integrity—really the result—of his prior civil habeas petition. In any event, L. Civ. R. 7.2, while normally applied in civil proceedings, is incorporated by reference in L. Cr. R. 1.1 and applicable to all briefs filed in connection with criminal proceedings as well.

connection with his latest Rule 60(b) and (d) application. The remaining eighty pages merely restate Defendant's <u>Brady</u> complaints that have been the basis of repeated adjudication for almost a decade. The Court will address each alleged misrepresentation in turn.

     **i.**    **Zucker Affidavit**

The first alleged misrepresentation concerns an affidavit by Arthur Zucker, a former federal prosecutor, that the government filed in connection with its opposition to Defendant's most recent Rule 60 application. That affidavit states, in its entirety:

> ARTHUR ZUCKER, being duly sworn, deposes and says:
>
> 1.     I was a federal prosecutor in the District of New Jersey from 1987 until March 1992. From 1990 until I left the office, I was the Assistant U.S. Attorney assigned to an investigation which focused on the embezzlement of approximately $4 million from the Compton Press Pension and Thrift Funds.
>
> 2.     The Case Agents on the investigation were Special Agent Rosario "Sal" Ruffino, from the Department of Labor, Office of Labor and Racketeering and Special Agent Dick Mohr from the Federal Bureau of Investigation. I do not specifically recall how the case was brought to the attention of the United States Attorney's Office.
>
> 3.     Carmine Pascale was an employee of the Department of Labor, Pension and Welfare Benefits Administration ("PWBA"). I recall meeting with Mr. Pascale on one or two occasions at the U.S. Attorney's Office in Newark, but I do not remember whether he had involvement in the Compton Press investigation or in some other matter. I do not recall working with Robert Goldberg of the PWBA on this or any investigation.
>
> 4.     I recall that I relied upon the following sources for the documents gathered during the investigation: 1) grand jury subpoena; 2) documents retrieved from a warehouse in Florida which had been seized pursuant to a search warrant by another district; and 3) attorneys involved in a civil lawsuit involving Compton Press. With respect to this last category of documents, I specifically recall meeting with and receiving materials from Kenneth Van Deventer, Esq., of the law firm Riker, Danzig, one of the attorneys involved in civil litigation concerning Compton Press.
>
> 5.     I have no recollection of a note from Sal Ruffino stating that the PWBA had documents that I may wish to look at. In fact, I do not recall getting any

> documents from the PWBA. I do, however, vaguely recall reading a newspaper
> article which described Leonard Pelullo's lavish lifestyle and mansion in Florida.

Defendant claims that this affidavit is false in two respects. First, he claims that Zucker could not have relied upon "documents retrieved from a warehouse in Florida" because he never reviewed the seized documents. (Pet. Br. 16-18). Second, he claims that Zucker misstates the role played by Carmine Pascale and Robert Goldberg, both of whom were deeply involved in the investigation. Id. at 21-23.

In support of his contention that Zucker never reviewed the documents from the Florida warehouse, Defendant cites to affidavits sworn by Zucker and former AUSA Jose Sierra in 1995. (Pet. Exs. 6, 7). In his 1995 affidavit, Zucker makes specific reference to the "Florida warrant" and "seized documents…retrieved for use in the Compton investigation." (Pet. Ex. 6 ¶ 5). However Zucker claims that "at no time before, or after, my departure from the United States Attorney's Office did I inspect any of those documents." Id. Similarly, Sierra states in his 1995 affidavit that he has "not read, or otherwise learned of the contents of, the affidavit and related papers submitted in support of the Florida warrant" and had "not inspected any of the documents seized…." (Pet. Ex. 7 ¶ 10).

Defendant further claims that the Compton Press documents from his Florida Office were not obtained until early 1993, months after Zucker departed the United States Attorney's Office. In support, Defendant offers a February 12, 1993 memo written by FBI Agent Richard Mohr. (Pet. Br. Ex. 10). The memo states, in relevant part:

> Newark is in the process of calling witnesses before a federal grand jury
> and subpoenaing documents for review concerning caption matter. Newark's
> investigation has reflected that Pelullo had orchestrated the take over of Compton
> Press and other companies throughout the country from an office in Miami,
> Florida. The records at Pelullo's office were ultimately seized by the Jacksonville
> office, likewise looking into a bankrupted company. The records seized would be
> vital in constructing the involvement of Pelullo and associates in Compton Press.

AUSA Jose Sierra, Newark, concurs with the investigators that the Jacksonville records must be reviewed and obtained in order to thoroughly document the Compton Press case. AUSA Sierra also agrees with the investigators because of the mere volume of the records seized, and the complexity of the investigation. It would necessitate that this task should be handled by the Newark FBI, as it would be unduly burdensome to FBI Jacksonville in assisting Newark in the development of its case.

On 2/8/93, the SAC Newark, because of the above situation, has approved travel to Jacksonville of SA and has agreed with the assistance of the labor department in reviewing the above documents seized by the Jacksonville office. SAC, Jacksonville concurs with Newark special agents travel. The department of labor special agents are, [redacted] and [redacted].

Newark anticipates traveling to Jacksonville on 2/23/93 and departing on 2/26/93. Newark will continue contact with Jacksonville regarding travel and lodging.

(converted to sentence case for legibility).

This memo is further substantiated by FBI inventory notes which state that the Florida documents were "acquired from the Jacksonville Division FBI on March 4, 1993." (Pl. Ex. 11). As noted above, Zucker left the United States Attorney's Office in March of 1992. (Zucker Aff. ¶ 1).

The government claims that this dispute comes to nothing. In its December 26, 2011 letter (Doc. No. 336) ("Reply"), the government argues that Zucker's claim that he "relied upon" the Florida documents as "sources" does not amount to a claim that he personally reviewed the Compton Press documents. Id. at 3-4. The government does not deny that the Florida documents were delivered to the Newark United States Attorney's Office in early 1993, but argues that Zucker's affidavit sought only to identify the sources of documents that he knew the investigation eventually obtained, and not to represent which documents he personally read.

Defendant also challenges Zucker's limited recollection of Carmine Pascale and Robert Goldberg, claiming that it "lacks any indicia of the[sic] truth or credibility." (Pet. Br. 21).

Defendant cites to numerous documents demonstrating that Pascale or Goldberg sat in on interviews conducted by Zucker in connection with the investigation. These interviews included:

- An interview of Senator Murray Schwartz transcribed on July 16, 1991 in which he discussed his investment in Away to Travel South, Inc. (Pet. May 10, 2011 Br. Ex. 10) (Doc. No. 90). Both Pascale and Goldberg are listed as present.

- A February 13, 1992 interview of Janice Larson in which she was asked about the liquidation of the UNUM Insurance Fund. (Pet. May, 12, 2006 Br. Ex. 39) (Doc. No. 23). Goldberg is listed as present.

In addition, Defendant points to a November 7, 1991 Department of Labor Memo that mentions Pascale's involvement in a "parallel criminal investigation" that was being "worked jointly" by OLR and NYAO. (Pet. Ex. 14).

Defendant notes that all of the documents that he relies upon were available to the government before the submission of the most recent Zucker affidavit. (Pet. Br. 23). Indeed, most were submitted as exhibits to Pellulo's original Rule 60(b) motion filed in 2006. Defendant claims that because these documents were well known, Zucker's representations about the Florida documents and the involvement of Pascale and Goldberg must be "knowing and intentional[]...." Id.

This is incorrect. The Zucker affidavit does not state with certainty that AUSA Zucker examined the Florida documents personally or that Pascale and Goldberg had absolutely no involvement with the investigation. Zucker merely states, many years after the fact, that he remembers relying upon the Florida documents and that he recalls working briefly with Pascale but not with Goldberg. While the use of the term "rely" in Zucker's affidavit may be slightly misleading, there is no evidence of any deliberate fraud on the Court. It is clear that Zucker knew about the Compton Press documents in the Florida office during his tenure at the United States Attorney's Office. It is entirely conceivable, and indeed likely, that Zucker recalls learning about

the Florida documents during the course of his involvement with the investigation and speaking

to others about obtaining them. Given the passage of years, it is hardly surprising that he cannot

recall with precision which document he actually examined and which he did not. Moreover, the

purpose of the affidavit was to substantiate how the United States Attorney's Office obtained

certain documents. In that light, it is understandable that Zucker would include all documents

that he knew that the office obtained, even if he did not have a specific recollection of reviewing

them.

Nor is Zucker incriminated by the fact that he does not recall Robert Goldberg's

involvement in the case. While Goldberg may have attended some witness interviews, Zucker

cannot be expected to remember the names and faces of every person who sat in on an interview

or was a minor participant in the prosecution team. Zucker did not swear that Goldberg did not

participate; merely that he does not remember him. There is no evidence to the contrary.

In addition, Defendant acknowledges that none of the documents that he presents are new

to the Court. To the extent that the affidavits submitted by the government can be read in tension

with the the well-established documentary record, the Court did not rely upon them in rendering

its July 22, 2011 Opinion. There is no basis for overturning that Opinion or granting Defendant

any of the additional relief that he requests.

**ii.      Ruffino Affidavit.**

Defendant's second alleged misrepresentation relates to an affidavit by Rosario Ruffino,

a former special agent with the United States Department of Labor who worked on the Pellulo

investigation. That affidavit states, in its entirety:

ROSARIO RUFFINO, being duly sworn, deposes and says:

1.      I am a former Special Agent of the United States Department of Labor. Office of
Labor Racketeering ("OLG"). I was involved in the investigation of Leonard Pelullo for

embezzlement of approximately $4 million from the Compton Press Pension and Thrift Funds. Although I retired from OLG in May 1995, I continued to assist in the prosecution of Leonard Pelullo from the fall of 1995 through the trial in November 1996 in my capacity as an employee of the Waterfront Commission.

2.    Carmine Pascale was an employee of the Depattment of Labor, Pension and Welfare Benefits Administration ("PWBA"). It is my recollection that he referred this matter to OLG for possible criminal prosecution based upon a complaint to his office.

3.     I recall that I worked with Robert Goldberg of the Pension and Welfare Benefits Administration ("PWBA") and Special Agent Dick Mohr of the Federal Bureau of Investigation with regards to the prosecution of the criminal case against Leonard Pelullo. I do not recognize the name of PWBA employee Michael Briglia. It is my recollection that once a grand jury investigation was initiated that there was a wall between any criminal and civil investigations.

4.    I believe that I relied upon the following sources for documents gathered during the investigation: 1) grand jury subpoenas and 2) six boxes retrieved from a warehouse in Florida which had been seized pursuant to a search warrant by another district.

5.    I have no recollection of sending a note to A USA Arthur Zucker in 1991 stating that the PWBA had documents that he may wish to look at. In fact, I do not recall getting any documents from the PWBA.

6.    I recall interviewing Janice Larson but I have no specific recollection concerning an interview with her and her attorney in March 1995.

Defendant claims that the statement that "once a grand jury investigation was initiated that there was a wall between any criminal and civil investigations" is so utterly false that it must be intentional and fraudulent. In support of this contention, he cites to several categories of familiar documents. The first are documents that demonstrate that Ruffino, Pascale, and Goldberg were members of the prosecution "team" both before and after the criminal investigation was commenced.[3] These documents include:

- A November 1, 1990 Department of Justice Case Initiation Report describing an investigation into possible charges against Pellulo. The individuals participating in the

---

[3]    To establish when the grand jury investigation began, Defendant cites a memo from March 11, 1991 which states that AUSA Zucker began issuing subpoenas in connection with a grand jury investigation of Pellulo on January 25, 1991. (Pet. Ex. 17).

investigation include: "AUSA A. Zucker" and "Agents D. Mohr–FBI; S. Ruffino–OLR; [and] C. Pascale–PWBA…." (Pet. Ex. 12).

- A November 5, 1990 Case Opening Report which described "a cooperative investigation between the FBI, PWBP, and OLR" into Compton Press. (Pet. Ex. 16).

- An interview of Senator Murray Schwartz transcribed on July 16, 1991 in which he discussed his investment in Away to Travel South, Inc. (Pet. May 10, 2011 Br. Ex. 10) (Doc. No. 90). Both Pascale and Goldberg are listed as present.

- A memo prepared on September 23, 1991 by agent Mohr which describes the status of the investigation of Pellulo in connection with Compton Press and states that "[t]his case is a joint investigation between the FBI and the Newark and New York Labor Departments…." (Pet. Ex. 18).

- A November 7, 1991 Memo, written by John Wehrum of the New York Area Office of the United States Department of Labor, which states that a "parallel criminal investigation" is "currently being worked jointly with OLR in New Jersey." (Pet. Ex. 14).

- A December 9, 1997 Significant Incident Report submitted by John McGlynn at the United States Department of Labor that described Pelullo's sentencing and states that "[t]his was a joint investigation with the Pension and Welfare Benefit Administration and the Federal Bureau of Investigation. (Pet. May 17, 2010 Br. Ex. 6) (Doc. 293).

- Former AUSA Jose Sierra's 2011 Affidavit submitted in connection with the government's opposition to Defendant's most recent Rule 60 application, in which Sierra recalls "limited" or "little" interaction with Ruffino and Pascale. (July 14, 2011 Opposition Ex. D) (Doc. No. 322).

Nothing presented by Defendant demonstrates that Agent Ruffino's affidavit was fraudulent or even false. As the Court of Appeals recognized in its 2004 opinion, "there is no question that certain DOL agents were integral members of the prosecution team." United States v. Pelullo, 399 F.3d 197, 216 (3d Cir. 2005). The question has never been whether certain Department of Labor Agents played a significant role in the criminal prosecution of the Defendant, but rather "whether the PWBA officials who possessed the documents at issue were members of the 'prosecution team' in this case." Id.[4] The presence of a few individuals at

_____

[4]    Indeed, the Court of Appeals was well aware of the role that loaner-agents like Ruffino played in the investigation, describing Ruffino as "the principal investigator in the District of

interviews does not support an inference that no measures were taken to separate the criminal and civil investigations after the grand jury was convened.

Moreover, Agent Ruffino's affidavit acknowledges that years have passed since the investigation and that the facts presented are made on the basis of his "recollection." Nothing presented by Defendant suggests that any factual errors present in the affidavit are the product of willful deceit rather than the intervening time.

Finally, the documents presented by Defendant are well known to the Court. Even if the affidavit presented by Agent Ruffino were entirely contrary to the factual record in this case— which it was not—such an affidavit would have had no impact on any decision rendered by the Court in this matter. Consequently, there is no basis for overturning any decision or granting Defendant any relief that he requests.

### iii.   Schwartz Argument

Defendant's third alleged misrepresentation concerns a footnote in a letter brief submitted by AUSA Schwartz in her June 14, 2011 letter. The footnote reads as follows:

> In footnote 1 to his 5/22/11 letter brief, defendant Pelullo notes that the DOL-OIG withheld documents obtained through grand jury subpoena pages based upon FOIA exemptions, which included exemptions related to grand jury secrecy, thereby suggesting that the government is trying to unfairly withhold information. It is worth noting that by letter dated March 2, 1995, an unsigned copy of which is annexed hereto as Exhibit "E," defendant Pelullo was advised that he could make arrangements to copy all of the documents in the possession of the U.S. Attorney's Office, including records obtained pursuant to grand jury subpoena. These arrangements were never made by the defendant.

---

New Jersey case…." 399 F.3d at 205. Indeed, the Court of Appeals specifically ***rejected*** "Pelullo's arguments…that [since] …agents in the DOL participated in the investigation...that the entire DOL is properly considered part of the prosecution team. Id. at 218. The Court of Appeals found that Pelullo had not shown that the specific DOL investigators who participated meaningfully in his prosecution had "constructive possession" of the disputed materials. Id. at fn. 23. Despite his numerous FOIA requests and multiple motions over the intervening years, Defendant has still failed to do so.

Defendant contends he did make arrangement to obtain copies of documents in the possession of the United States Attorney's Office. In support, he cites to a letter he sent to AUSA Ruffolo on March 16, 1993 indicating that he had engaged a copy firm, Reprotech, to make copies of documents. (Pet. Ex. 1). He also attaches a transcript of a March 28, 1995 hearing in which AUSA Ruffolo confirms that the copy job is in progress. (Pet. Ex. 20).

The government claims that Schwartz's statement was not meant to suggest that Defendant failed to make arrangements to copy any of the files, but rather that he failed to make arrangements to copy "*all* of the documents in the possession of the U.S. Attorney's Office…." (emphasis added). This is a somewhat strained reading of the footnote, as the following sentence: "These arrangements were never made by the defendant" suggests that no arrangements were made, not that Defendant made arrangements to copy some documents, but failed to copy everything. But even if this statement—as an aside in a footnote—is incorrect, there is nothing to suggest that is anything other than an innocent mistake. Defendant presents no evidence of fraudulent intent by the government, and the Court did not rely on this footnote in rendering its decision. Even if it is now rejected, there is no basis for overturning any decision of the Court or granting Defendant any relief that he requests.

### iv.    Hellhake Deposition

Defendant's final alleged misrepresentation concerns two statements made in the government's June 14, 2011 brief concerning the deposition of George Hellhake. The first relevant portion of the brief reads as follows:

> The bankruptcy deposition of George Hellhake, who was neither a government nor defense witness at trial, constitutes neither Giglio nor Brady material. Indeed, the defendant had knowledge of and access to this deposition in this wholly unrelated matter, the deposition does not support Pelullo's contention that George Hellhake made a profit on his sale of DWG stock, and further whether or not George Hellahake made a profit on the stock was completely irrelevant to the

subject matter of the prosecution. In addition, markings on the front of the George Hellahake deposition indicate that it was marked as an exhibit to the Andrew Heine deposition taken pursuant to the Compton Press litigation. The Andrew Heine deposition was provided to defendant Pelullo as part of Jencks material during this case.

In addition, a footnote claims that:

It is unclear whether this deposition or the other documents requested were ever received by the United States Attorney's Office, and whether the George Hellhake deposition requested was from the Ocean Properties bankruptcy proceeding. Unfortunately, the Dillon, Bitar law firm no longer has records relating to this matter from prior to 2000. Nevertheless, the fact that the government requested this document from a private law firm supports the position that the prosecution team was not working in conjunction with investigators in the PWBA who were monitoring the civil lawsuits.

Defendant claims that neither statement is true. First, he claims that the government never provided him with the Hellhake deposition, as "[t]he government provided Petitioner with only the Heine deposition and none of the Exhibits." (Pet. Br. 39). Second, he argues that he was not involved with the Ocean Properties bankruptcy and had no ability to independently attend the Hellhake deposition or access the transcript. Id. at 40. Third, Defendant claims that the Hellhake deposition would have been material to his defense, as it could have been used to effectively cross-examine or discredit David Hellhake, a witness against Defendant at trial. Id. at 41. Last, Defendant claims that the United States Attorney's Office received the Hellhake deposition when it was sent by attorneys at the Dillon Bittar firm to PWBA investigators in November of 1991. Id. at 39.

Defendant's argument fails on numerous grounds. First, Defendant provides no evidence that the Hellhake deposition was not included as an exhibit to the Heine deposition in the Jencks material turned over by the government. This is merely asserted in his brief. Second, while Defendant was not a party to the In re: Ocean Properties bankruptcy, Ocean Properties was a corporate entity over which Defendant had exerted significant control. Defendant was well aware

19

of the bankruptcy proceedings even if he was not a participant and his counsel may have been able to obtain access to the Hellhake Deposition if they had sought to do so. Third, the Hellhake deposition is not clearly material to Defendant's defense. George Hellhake was not a witness in Defendant's trial, and his deposition would not have been admissible as evidence. Even if George Hellhake had been called by the defense, his testimony would have been of marginal impact—serving at best to discredit or impeach his son on tangential issues.[5] Since David Hellhake admitted at trial that he lied under oath in other depositions and court sanctioned affidavits about critical issues, the additional value of this impeachment evidence is marginal at best. Last, the only evidence that Defendant provides that the United States Attorney's Office received the Hellhake deposition is a FOIA response from the United States Department of Labor (Pet. Ex. 13). But nothing in this letter describes a "joint" investigation between PWBA and the United States Attorney's Office where documents were routinely exchanged. Moreover, the writer of this letter is a mere functionary with no actual knowledge concerning the contents of the United States Attorney's Office case files, when they received documents, or whether they shared documents with PWBA before the commencement of the trial.

But most relevantly, none of Defendant's evidence demonstrates that any intentional misrepresentations were made in connection with the June 14, 2011 brief. At best, Defendant can show that the government misspoke when it claimed that the Hellhake deposition was contained in the Jencks materials provided to Defendant. Nothing provided by Defendant suggests actual knowledge or deliberate fraud by the government that would justify either an ethics inquiry or

---

[5]     Indeed, the government argued persuasively in its August 27, 2010 brief that George and David Hellhake's testimony is largely consistent, and the matter on which they differ—whether GH Enterprises made a profit in the Granada/DWG transaction—is really one of perspective, with one party taking the position that the deal "made no actual profit" and the other claiming that GH Enterprises did not ""receive[] back its investment."

some other form of extraordinary intervention by the Court. If the statement by the government was incorrect, it was likely the sort of inadvertent mistake that is nearly inevitable in the course a case with the volume of historical material found here.

### C.      Bail

Bail pending disposition of post-conviction habeas corpus review of a conviction is available "only when the petitioner has raised substantial claims upon which he has a high probability of success or exceptional circumstances exist which make a grant of bail necessary to make the habeas remedy effective." <u>Landano v. Rufferty</u>, 970 F.2d 1230, 1239 (3d Cir. 1992), *cert*. *denied*, 506 U.S. 955 (1992). As Defendant's contentions both are meritless and beyond the jurisdiction of this Court, it would be inappropriate to award bail. Consequently, Defendant's request for bail will be denied.

### III.      CONCLUSION

For the reasons set forth above, Defendant's applications are denied.


s/ Dickinson R. Debevoise<br>DICKINSON R. DEBEVOISE, U.S.S.D.J.


Dated:  January 25, 2012